El Juez Asociado Sr. Marrero no intervino.

BELARMINO ÁLVAREZ FEITO, demandante y apelante, *v.* SECRETARIO DE HACIENDA, demandado y apelado.

Número 11037.

*Sometido:* 1 de noviembre de 1955. *Resuelto:* 24 de junio de 1957.

---

*Heriberto Torres Solá*, abogado del apelante; *Hon. Secretario de Justicia Interino J. B. Fernández Badillo* y *Manuel J. Medina Aymat, Procurador Auxiliar*, abogados del apelado; *Vicente Zayas Pizarro, Orlando J. Antonsanti, Benjamín Ortiz, Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella* y *C. Morales, Jr.*, abogados de Pedro Juan Serrallés Galiano, éste como *amicus curiæ;* y como *amici curiæ E. T. Fiddler, José G. González, Tomás I. Nido, Carlos J. Faure, Andrés Guillemard, J. M. Calderón Cerecedo, Richard J. González* y *Pedro Agudo, Jr.; McConnel, Valdés & Kelley; James R. Beverley, R. Castro Fernández* y *Francisco Castro Amy;* y *Manuel I. Vallecillo.*

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

### EN MOCIÓN DE RECONSIDERACIÓN

En 1942 Belarmino Álvarez Feito constituyó un fideicomiso de acciones de una corporación a favor de sus dos hijos menores de edad. En 1950 el entonces Tesorero notificó a Álvarez ciertas deficiencias de contribuciones sobre ingresos para los años 1943, 1944 y 1945 fundadas en que el ingreso proveniente del fideicomiso era atribuíble a Álvarez. Éste radicó querella ante el anterior Tribunal de Contribuciones para que se dejaran sin efecto las referidas deficiencias. Luego de un juicio en los méritos, el anterior Tribunal de Contribuciones sostuvo la actuación del Tesorero y declaró sin lugar la querella.

Por los motivos expuestos en su opinión, la mayoría de este Tribunal confirmó la sentencia del tribunal sentenciador. *Álvarez* v. *Sec. Hacienda*, 78 D.P.R. 412. El Juez Asociado Sr. Pérez Pimentel y el autor de esta opinión concurrimos en

el resultado. El contribuyente radicó moción de reconsideración. Además, varios *amici curiae* han comparecido pidiéndole al Tribunal que cambie los fundamentos de su sentencia. El Secretario de Hacienda ha radicado su oposición a la moción del contribuyente y a las de los *amici curiae*.

## I

### *Validez del Fideicomiso*

En el umbral del caso nos confrontamos con la cuestión de si, como ocurre aquí, un fideicomiso puede ser creado válidamente por el padre con sus propios bienes en beneficio de sus hijos menores de edad no emancipados. [1]

Este problema no se le presentó al tribunal sentenciador ni fué resuelto por aquél. [2] Tampoco las partes lo argumentaron ante nos en sus alegatos originales. Sin embargo, toda vez que el mismo es examinado en detalle en la anterior

---

[1] Suponemos *argüendo*, según sostiene la anterior opinión de la mayoría, que en 1942 se constituyó un fideicomiso irrevocable no obstante el esfuerzo anterior del padre en 1941 de hacer a los beneficiarios una donación absoluta de las acciones aquí envueltas. También suponemos que no surge problema alguno debido a lo siguiente: (1) los certificados de acciones fueron librados originalmente a favor de los dos menores y nunca fueron transferidos a los fiduciarios en los libros de la corporación; (2) los cheques de dividendos fueron expedidos a la orden de los menores; (3) dichos cheques fueron endosados a nombre de cada uno de los menores "por" el fiduciario y depositados en un banco. Tampoco hemos considerado los requisitos de ley en cuanto a la duración de un fideicomiso. Véanse los arts. 839, 842, 846 y 848 del Código Civil, 31 L.P.R.A. secs. 2546, 2549, 2553 y 2555.

[2] El tribunal sentenciador basó su decisión en dos fundamentos: Primero, no existe un fideicomiso válido porque el fideicomitente no era dueño de las acciones cuando trató de constituir el fideicomiso en 1942 toda vez que las había donado a sus hijos en 1941. (Hemos supuesto—y la anterior opinión de la mayoría así lo sostiene—que la "donación" anterior no perjudicó por sí misma la validez del fideicomiso, véase el escolio 1.) Segundo, aun suponiendo que el fideicomiso es válido, el derecho potencial de los hijos a retirar el ingreso del fideicomiso lo hace tributable a su padre-fideicomitente, citando los arts. 155 y 156 del Código Civil, la sec. 20(*h*) de nuestra Ley de Contribuciones sobre Ingresos, los arts. 201 y 207(2) del Reglamento núm. 1, *Helvering* v. *Stuart*, 317 U. S. 154, y *Helvering* v. *Clifford*, 309 U. S. 331. Discutimos este segundo fundamento en la Parte II, infra.

opinión de la mayoría y en los alegatos en reconsideración, creemos conveniente pasar sobre la cuestión de la validez del fideicomiso aquí envuelto.

El punto básico en que debemos hacer hincapié al comenzar es que en un fideicomiso el título legal de los bienes y las utilidades que resultan de dichos bienes son dos cosas separadas. El fiduciario es el dueño del título legal, mientras que la "propiedad en equidad" descansa en los beneficiarios. Esta división entre el título legal y la propiedad en equidad es la médula del concepto de fideicomiso. Es contraria a los conceptos del derecho civil en que el fideicomiso, según existe en el derecho angloamericano, era desconocido anteriormente. ($^3$) Pero el fideicomiso se ha hecho formar parte de nuestro Código Civil. ($^4$)

($^3$) Patton, *Trust Systems in the Western Hemisphere*, XIX Tulane L. Rev. 398; Patton, *El Futuro de la Legislación de Fideicomiso*, XVII Rev. Jur. U.P.R. 221, 224; Mayda, *"Trusts" and "Living Law" in Europe*, 103 U. Pa. L. Rev. 1041, y autoridades allí citadas; Bolgár, *Why no Trusts in the Civil Law*, 2 Am. J. Comp. L. 204; 1 *Restatement, Trusts, Introductory Note;* I Scott, *Trusts*, 2da. ed., págs. 3–10; II, id., págs. 962–74.

($^4$) La Ley núm. 41, Leyes de Puerto Rico, 1928, que dispone la constitución de los fideicomisos, fué incorporada al Código Civil como sus arts. 834 al 874.

El art. 834 del Código Civil, 31 L.P.R.A. sec. 2541, define un fideicomiso como sigue: "El fideicomiso es un mandato irrevocable a virtud del cual se trasmiten determinados bienes a una persona, llamada fiduciario, para que disponga de ellos conforme lo ordene la que los trasmite, llamada fideicomitente, a beneficio de este mismo o de un tercero, llamado fideicomisario."

La frase "mandato irrevocable" fué usada en un esfuerzo por encajar el concepto de fideicomiso en términos que fueran conocidos a los civilistas. La sabiduría de describir la ley de fideicomisos en términos del mandato ha sido cuestionada. De cualquier modo, *lo importante es que el art. 834 reconoce que ". . . se trasmiten . . . bienes . . ." al fiduciario.* Conforme a esto, según lo ha reconocido este Tribunal, el fiduciario es el dueño del título legal de los bienes en fideicomiso, no empece que en el art. 834 se caracterice el fideicomiso como un "mandato irrevocable". *Belaval* v. *Tribl. de Expropiaciones*, 71 D.P.R. 265; *Clínica Juliá* v. *Sec. de Hacienda,* 76 D.P.R. 509; *Douglas* v. *Registrador*, 55 D.P.R. 665; véase Patton, supra, págs. 413, 420–21, particularmente el escolio 55. Véase además, el art. 865 del Código Civil, 31 L.P.R.A. sec. 2572.

La separación entre el título legal y la propiedad en equidad se ilustra vivamente por la regla de que un padre puede usar sus propios bienes para crear un fideicomiso para sí. Artículo 834 del Código Civil, 31 L.P.R.A. sec. 2541; *Douglas* v. *Registrador*, supra.

La separación entre el título legal y la propiedad en equidad en un fideicomiso constituyó el *ratio decidendi* de la Parte I en el caso de *Belaval* v. *Tribl. de Expropiaciones,* supra. En dicho caso los padres crearon un fideicomiso sobre ciertos bienes inmuebles a favor de sus dos hijos menores de edad y de uno concebido pero no nacido aún. Posteriormente, El Pueblo de Puerto Rico expropió los terrenos en cuestión. En una decisión unánime resolvimos, revocando al anterior Tribunal de Expropiaciones, que el dinero depositado por El Pueblo como compensación por dichos bienes debía ser pagado directamente al fiduciario en vez de seguirse el procedimiento provisto en los arts. 614 *et seq.* del Código de Enjuiciamiento Civil, ed. de 1933, 32 L.P.R.A. secs. 2721 a 2723—en relación con los arts. 159 y 212 del Código Civil, 31 L.P.R.A. secs. 616 y 786—para la enajenación o gravamen de bienes de menores.

Dijimos en el caso de *Belaval* a la pág. 271 que la orden en contrario del anterior Tribunal de Expropiaciones ". . . está en pugna abierta con el concepto básico de la institución sobre fideicomiso traída a Puerto Rico por la Ley de 1928, que es una adaptación de la que se había hecho en Panamá en el año 1925 siguiendo el sistema anglosajón de 'trusts'." Después de citar los arts. 834, 849 y 864 a 867 del Código Civil, 31 L.P.R.A. secs. 2541, 2556 y 2571 a 2574, relativos a fideicomisos, añadimos a las págs. 273 a 274:

"De acuerdo con estas disposiciones resalta el error en que incurrió el tribunal inferior al sostener que para la inversión de los bienes en fideicomiso de que se trata, deben aplicarse los artículos 614 y siguientes del Código de Enjuiciamiento Civil, que son aquéllos que se refieren al procedimiento a seguirse en aquellos casos en que, según el Código Civil, necesitan los padres o tutores de menores o incapacitados, autorización judicial para actos o contratos que se refieren a la guarda de dichos menores o incapacitados y de sus bienes. *En estos casos se trata de bienes pertenecientes al menor o incapacitado. En el del fideicomiso, los bienes que pertenecían al fideicomitente han sido trasmitidos al fiduciario, quien tiene todos los derechos y acciones correspondientes al pleno dominio,* con la única limitación de

que el traspaso se hace de acuerdo con lo que haya ordenado el fideicomitente, para beneficio del fideicomisario. . . . *El título sobre las propiedades traspasadas en fideicomiso está en el fiduciario y así inscrito en el Registro de la Propiedad sujeto a las condiciones del fideicomiso, y no en los menores beneficiarios en este caso.* . . . La parte realmente interesada en obtener el dinero consignado en el procedimiento de expropiación forzosa no la constituyen los menores sino el fiduciario, pues a él correspondería iniciar cualquier acción que, como consecuencia de dicho procedimiento, pudiera surgir. . . ." (Bastardillas nuestras, excepto "pleno dominio".)

Como se desprende de la anterior cita, reconocimos en el caso de *Belaval* que en un fideicomiso los bienes pertenecen al fiduciario, aun cuando desde luego se administran para beneficio del fideicomisario. Teniendo en mente que el título legal y el interés en equidad son separados, pasamos a la contención de que un fideicomiso no puede válidamente crearse por un padre a nombre de sus hijos menores con bienes pertenecientes al padre. Esta contención, que es aceptada en la anterior opinión de la mayoría, no puede reconciliarse con los casos de *Belaval* v. *Tribl. de Expropiaciones*, supra, y *Clínica Juliá* v. *Sec. de Hacienda*, supra. Antes del caso de autos, este Tribunal nunca había discutido específicamente la cuestión de la validez de un fideicomiso creado por un padre en beneficio de sus hijos menores de edad bajo el Código Civil. Pero en los casos de *Belaval* y de *Juliá* nuestras decisiones necesariamente se basaron en la premisa de que tal fideicomiso es válido.[5]

Como ya se ha indicado, resolvimos en el caso de *Belaval* que el dinero depositado como compensación por la expropiación de bienes en fideicomiso debía ser pagado directamente al fiduciario en vez de seguirse el procedimiento provisto en los arts. 614 *et seq.* del Código de Enjuiciamiento Civil. Aun más significativo, sobre el punto ahora bajo consideración, es

---

[5] En verdad, como ya hemos indicado, aún en el presente caso el Secretario de Hacienda no argumentó en su alegato original ante este Tribunal que un padre no puede válidamente constituir un fideicomiso para sus hijos menores de edad de acuerdo con el Código Civil.

el hecho de que en el caso de *Belaval* el fiduciario no habría tenido derecho al depósito hecho por el Pueblo si el fideicomiso no hubiera sido válido.

El caso de *Belaval* también trata de la cuestión de si bienes puestos en fideicomiso para un menor ya concebido pero no nacido aún, estaban sujetos a la contribución sobre donaciones impuesta por la Ley núm. 303, Leyes de Puerto Rico, 1946, 13 L.P.R.A. secs. 881 a 905. A tenor con la sec. 1 de la Ley núm. 303, 13 L.P.R.A. sec. 881, una donación ". . . incluye también cualquier transferencia en fideicomiso (*trust*)." En el caso de *Belaval* el menor fué concebido antes de la fecha de vigencia de la Ley núm. 303, pero nació después de la referida fecha. Resolvimos en la Parte II de la opinión del caso de *Belaval* que la contribución sobre donaciones no tenía que ser pagada sobre esta transferencia porque el fideicomiso tuvo eficacia cuando la escritura de fideicomiso se otorgó y fué aceptada por el fiduciario antes de la fecha de vigencia de la Ley núm. 303, y no cuando nació el menor con posterioridad a la fecha de vigencia de dicha Ley. También indicamos que el fideicomiso respondía de la contribución impuesta bajo la sec. 20 (*a*) (1) de la Ley de Contribuciones sobre Ingresos. Nuevamente aquí el significado de la Parte II de la opinión del caso de *Belaval* es que nuestra discusión de la cuestión de la contribución sobre donaciones estaba predicada en la premisa de que se puede válidamente crear un fideicomiso por el padre a favor de sus hijos menores, tanto de los ya nacidos como de los no nacidos aún. *Belaval* v. *Tribl. de Expropiaciones,* supra, págs. 276–82.

En el caso de *Juliá,* el Dr. Juliá y su esposa establecieron un fideicomiso de acciones de la Clínica Dr. Mario Juliá, Inc., a favor de sus dos hijos menores de edad. Bajo los términos del fideicomiso cada uno de los beneficiarios tenía derecho a recibir 25% del ingreso neto procedente del fideicomiso, que no excediera de $2,400; el fiduciario tenía la facultad de reinvertir el remanente del ingreso del fideicomiso. El fiduciario prestó a la corporación la suma de $70,000 con intereses

al 5% anual. La corporación pagó los intereses al fiduciario en 1946, 1947 y 1948. Resolvimos, contrario a la contención del Secretario de Hacienda, que la corporación tenía derecho a deducir estos pagos de intereses. Así lo resolvimos porque, contrario a la Ley Federal, la sec. 32 (a) (2) de nuestra Ley, según fué enmendada por la Ley núm. 107, Leyes de 1943, no prohibía las deducciones de tales pagos de intereses en relación con un *fideicomiso*. *Clínica Juliá* v. *Sec. de Hacienda*, supra, págs. 533–42, 546–49. Es importante advertir que si el fideicomiso no hubiera sido válido, las acciones hubieran pertenecido al Dr. Juliá y a su esposa más bien que a los fiduciarios. Y nuestra sec. 32 (a) (2), tal cual disponía entonces, hubiera prohibido la deducción de intereses pagados por la corporación al Dr. Juliá y a su esposa, toda vez que ellos eran dueños de la mayoría de las acciones de la corporación. Aquí nuevamente la implicación necesaria de nuestra decisión fué que el fideicomiso creado por el Dr. Juliá y su esposa en beneficio de sus hijos menores de edad era válido. En verdad, nuestra discusión del caso de *Helvering* v. *Clifford*, supra, en el caso de *Juliá* a las págs. 540–541—y nuestra conclusión en dicho caso al efecto de que la doctrina del caso de *Clifford* no era de aplicación a los hechos del de *Juliá*—no podía tener significación alguna a no ser que estuviéramos aceptando la validez del fideicomiso propiamente dicho.

Reafirmamos la posición que implícitamente asumimos en los casos de *Belaval* y de *Juliá* sosteniendo la validez de un fideicomiso creado por un padre a nombre de sus hijos menores con bienes pertenecientes al padre. De acuerdo con el art. 855 del Código Civil, ed. de 1930, 31 L.P.R.A. sec. 2562, un fideicomiso puede crearse ". . . en cualquier forma, para cualquier fin y bajo cualesquiera términos o condiciones que no infrinjan la ley o la moral pública o que no se prohiban específicamente en este Código." Nada encontramos en el Código Civil que *prohiba específicamente* a un padre crear con sus bienes un fideicomiso a favor de sus hijos menores de edad. No vemos motivo alguno para injertarle tal restric-

ción al art. 855. Además, existen casos análogos que nos convencen de que tal fideicomiso es válido. Primeramente, un padre puede bajo las circunstancias debidas hacerle una donación a sus hijos menores de edad. (⁶) En segundo lugar, puede crear un fideicomiso, presumiblemente con sus propios bienes, a favor de sus hijos futuros. (⁷) En tercer lugar, según admite la opinión anterior de la mayoría en 78 D.P.R. a la pág. 423, un extraño puede crear válidamente un fideicomiso a favor de un menor. Los problemas con referencia a bienes y a ingresos de un menor son sustancialmente los mismos en estas tres situaciones que en el caso de autos. Nuestro Código Civil permite los fideicomisos y las donaciones en estos tres casos; en la misma forma, el fideicomiso aquí envuelto es válido. (⁷ᵃ)

Nada encontramos en los arts. 155 y 156 del Código Civil que sea incompatible con nuestra conclusión de que un fideicomiso puede crearse válidamente por un padre con sus propios bienes a favor de un hijo menor de edad. El art. 156

(⁶) Un fideicomiso es distinto a una donación graciosa. *Piris* v. *Registrador*, 67 D.P.R. 811. Pero aun en el caso de una donación, no hay motivo alguno por el cual bajo las circunstancias debidas un padre no pueda hacer una donación a sus hijos menores de edad. II Rodríguez Navarro, *Doctrina Civil del Tribunal Supremo 1798-9*, comentando el art. 625 del Código Civil Español, equivalente al art. 567 de nuestro Código Civil, 31 L.P.R.A. sec. 2002; *Piris* v. *Registrador*, supra; Federico de Castro, *El Autocontrato en el Derecho Privado Español*, 151 Revista de Legislación y Jurisprudencia, 384, 416 *et seq.* (1927).

(⁷) El art. 845, 31 L.P.R.A. sec. 2552, prescribe así: "La constitución de fideicomiso a favor de persona no existente, a excepción únicamente de hijos futuros del fideicomitente, será nula y sin valor." La sec. 20 (a) (1) de la Ley de Contribuciones sobre Ingresos siempre ha reconocido el fideicomiso a favor de hijos aún no nacidos para fines contributivos.

Es difícil creer que la Asamblea Legislativa tuvo por miras el permitir la creación de tales fideicomisos establecidos por un padre en beneficio de hijos por nacer y prohibirlos para hijos ya nacidos. Véase el último párrafo del art. 867 del Código Civil.

(⁷ᵃ) Los arts. 847 y 774 del Código Civil, 31 L.P.R.A. secs. 2554 y 2581, prohiben el uso de los fideicomisos para derogar o modificar el sistema hereditario establecido por el Código Civil. Pero esa medida previsora no hace ineficaz per se el fideicomiso aquí envuelto. Haremos frente, cuando surjan, a los problemas de herencia a la luz del fideicomiso aquí envuelto. Véase la segunda cláusula de la escritura de fideicomiso según ésta aparece en 78 D.P.R. a la pág. 421.

nada tiene que ver con tal fideicomiso ya que dicho artículo no contempla el traspaso de la propiedad por el padre. (⁸) El art. 155 nada tiene que ver con el cuerpo del fideicomiso, ya que como hemos visto éste se "adquiere" por el fiduciario y no por el menor. (⁹) El art. 155 sólo entraría en juego si y cuando se recibiese por los beneficiarios menores de edad algún ingreso del fideicomiso de conformidad con la escritura de fideicomiso. Tal ingreso serían bienes adquiridos por los menores "a título lucrativo". (¹⁰) Y bajo el art. 155 dicho ingreso pertenecería a los menores en calidad de propiedad de éstos, pero el usufructo de este ingreso pertenecería al padre en este caso. Resolvemos en la Parte II, en vista de la administración y control por el padre del derecho de los beneficiarios menores de edad a recibir el ingreso del fideicomiso aquí envuelto y en vista de otros factores, que dicho ingreso es tributable al padre-fideicomitente, aun cuando dicho ingreso sea propiedad perteneciente a los menores bajo el art. 155. Pero estas consideraciones en cuanto a (1) título sobre el cuerpo del fideicomiso y sobre los ingresos de éste bajo el art. 155 y (2) la tributabilidad de éstos al padre-fideicomitente bajo nuestra Ley de Contribuciones sobre In-

---

(⁸) La primera oración del art. 156 dispone: "Pertenece al padre o a la madre en propiedad y usufructo lo que el hijo adquiera con caudal de cada uno de ellos."

Véase 4 Castán, *Derecho Civil Español, Común y Foral,* sexta edición, que interpreta el art. 161 del Código Civil Español, equivalente a nuestro art. 156, a la pág. 48: "(a) *Bienes adquiridos con caudal de los padres, que éstos hayan puesto bajo la administración del hijo.* Ya hemos dicho que vienen a sustituir el antiguo peculio profecticio. Los hijos tienen sobre tales bienes únicamente la administración precaria que les hayan concedido sus padres (de los cuales son verdaderos mandatarios); y los padres conservan la propiedad y el usufructo del caudal y de todos sus rendimientos, a no ser que cedan expresamente al hijo el todo o parte de las ganancias que obtengan, en cuyo caso no estarán estas últimas sujetas a colación (art. 161)."

(⁹) El art. 155 provee en parte lo siguiente: "Los bienes que el hijo no emancipado haya adquirido o adquiera con su trabajo o industria, o por cualquier título lucrativo, pertenecen al hijo en propiedad, y en usufructo a los padres que le tengan en su potestad y compañía . . .".

(¹⁰) En la versión en inglés de esta opinión usamos la frase "título lucrativo" y no *"for a valuable consideration"* por no ser ésta una traducción adecuada de la primera.

gresos, no menoscaba la validez del fideicomiso creado bajo los arts. 834 a 874 del Código Civil.([10a]) Por el contrario, son parte de la fórmula mediante la cual armonizamos (1) los arts. 155 y 156 y otros artículos del Código Civil, con (2) los arts. 834 a 874 del Código Civil, que proveen la constitución de fideicomisos, y con (3) las secciones de la Ley de Contribuciones sobre Ingresos que se refieren a ingresos de fideicomisos.([11])

Finalmente indicamos que en este caso es innecesario considerar la cuestión de si un padre con patria potestad puede jamás renunciar o enajenar el usufructo de bienes pertenecientes a sus hijos menores de edad. En primer lugar, no existe problema alguno con respecto al cuerpo del fideicomiso: nada hay que pueda el padre renunciar, ya que fué el fiduciario y no el menor el que adquirió los bienes en fideicomiso. En segundo lugar, en cuanto al ingreso del fideicomiso, baste decir en este caso que el padre no ha renunciado el usufructo de dicho ingreso en vista del hecho de que—como se expone en

([10a]) El art. 849 del Código Civil, 31 L.P.R.A. sec. 2556, controla la cuestión del consentimiento para constituir un fideicomiso. Dicho artículo provee en parte: "La vida legal de un fideicomiso comienza desde que el fiduciario acepta el mandato, con lo cual se hace irrevocable." El art. 849 se aplica aquí y también a fideicomisos para fines no pecuniarios y a fideicomisos para hijos futuros bajo el art. 845. Como ya se ha indicado en la Parte II del caso de *Belaval* v. *Tribl. de Expropiaciones*, supra, págs. 276 a 282, específicamente resolvimos que el fideicomiso en dicho caso tuvo vigencia cuando el fiduciario aceptó el fideicomiso y no cuando posteriormente nació el menor.

([11]) Es interesante indicar que la sec. 20 de nuestra Ley de Contribuciones sobre Ingresos reconoció en 1925 un fideicomiso para fines contributivos aun antes de que se autorizaran los fideicomisos por la Ley núm. 41, Leyes de Puerto Rico, 1928.

Además, si bien no gobierna el caso ante nos, la Asamblea Legislativa aparentemente pensó en 1954 que un fideicomiso como el aquí envuelto era válido. Dispuso en la sec. 167(c) de la Ley de 1954 que el ingreso de un fideicomiso no es tributable al fideicomitente meramente porque dicho ingreso pueda ser aplicado para alimentos de un beneficiario a quien el fideicomitente está legalmente obligado a alimentar excepto hasta el monto en que dicho ingreso sea de hecho así aplicado. Al así ponerse a la par con la Ley Federal tal como ésta leía antes del 1954, véase el escolio 16, la Asamblea Legislativa aparentemente supuso que un fideicomiso como el que nos ocupa era válido.

detalle en la Parte II—bajo el Código Civil el derecho de los beneficiarios menores de edad a retirar el ingreso según se provee en la escritura de fideicomiso aquí envuelta le da derecho al padre a administrar y a controlar el ingreso del fideicomiso.([12])

Resolvemos que el fideicomiso en este caso es válido no obstante haber sido creado por un padre con sus propios bienes en beneficio de sus hijos menores no emancipados.([13]) Pasemos ahora a la diferente cuestión de si el ingreso del fideicomiso en este caso es tributable al fideicomitente.

## II

*Aunque el fideicomiso sea válido, el ingreso procedente de éste es tributable al fideicomitente.*

 El hecho decisivo en este caso es que la cláusula quinta de la escritura de fideicomiso, según aparece en 78 D.P.R. a las págs. 421–22, instruye a los fiduciarios a invertir las utilidades ". . . que no hayan sido retiradas . . ." por los

---

([12]) *Cf. Guerra* v. *Ortiz,* 71 D.P.R. 613, confirmado en 187 F.2d 496 (C.A. 1, 1951); *Hernández* v. *Tribl. Contribuciones,* 73 D.P.R. 710; *Fournier* v. *Fournier,* 78 D.P.R. 430; y *Blanco* v. *Tribl. de Contribuciones,* 72 D.P.R. 855, 864, ninguno de los cuales controla esta cuestión específica.

Si la escritura de fideicomiso obligaba específicamente al fiduciario a acumular el ingreso del fideicomiso o a gastarlo en alguna otra forma que no fuera entregándolo al beneficiario menor de edad, podría surgir una cuestión diferente en cuanto a renuncia del usufructo por el padre. Es innecesario enfrentarnos a dicha cuestión en este caso y nada decimos en cuanto a la misma.

([13]) Los fideicomisos frecuentemente son creados para propósitos distintos a los de contribuciones sobre ingresos. De ser este fideicomiso nulo —según se indica en la anterior opinión de la mayoría—podrían surgir problemas que envuelvan la sucesión, los acreedores y los pagos a los beneficiarios. Véase Schuyler, *Payments under Void Trusts,* 65 Harv. L. Rev. 597. Otras cuestiones habrían también acosado a las partes a la luz de la anterior opinión de la mayoría. Primeramente, ¿podría tal fideicomiso, si bien nulo en sus comienzos, convertirse en válido de permanecer sin sufrir modificación alguna y llegar los beneficiarios a su mayor edad? En segundo lugar, de contestarse esta pregunta en la afirmativa, ¿sería el ingreso del fideicomiso bajo estas circunstancias tributable al fideicomitente después de llegar los beneficiarios a ser mayores de edad? En tercer lugar, ¿qué impacto tendría la sec. 167(c) de la Ley de Contribuciones sobre Ingresos de 1954—véanse escolios 16 y 11—en este caso y en otros similares en cuanto a ingreso obtenido después de su fecha de vigencia?

beneficiarios. Como indicamos en la Parte I, el art. 156 del Código Civil nunca es de aplicación al cuerpo o a las utilidades de un fideicomiso, véase el escolio 8 y el texto que lo precede. También, como hemos visto en la Parte I, a tenor con el art. 155 el cuerpo de un fideicomiso pertenece al fiduciario, pero cualquier ingreso proveniente del mismo recibido por los menores beneficiarios constituiría propiedad de menores; por otro lado, el usufructo de este ingreso pertenecería al padre-fideicomitente.

Aquí la escritura de fideicomiso permite a los beneficiarios retirar las utilidades. Pero el art. 154 exigía al padre (1) determinar si ejercitaba este derecho a retirar las utilidades y (2) administrarlas para los beneficiarios menores de edad si y cuando fueran recibidas de los fiduciarios.[14] Esta facultad de retirar y administrar las utilidades de parte del padre—junta con la propiedad del padre en el usufructo de tales utilidades de conformidad con el art. 156—son suficientes para que el ingreso del fideicomiso sea tributable al padre a tenor con las secs. 22($h$) y 15($a$) de la Ley de Contribuciones sobre Ingresos. *Helvering* v. *Stuart*, supra, y *Helvering* v. *Clifford*, supra.

En el caso de *Stuart* el Tribunal Supremo resolvió, a las págs. 169 a 171, que a tenor con la sec. 167 del Código Federal de Rentas Internas entonces en vigor, un padre que establecía un fideicomiso con una disposición al efecto de que el ingreso del mismo podría, a discreción de los fiduciarios, usarse para alimentos de sus hijos menores de edad, respondía de contribuciones sobre el ingreso del fideicomiso aun cuando de hecho dicho ingreso no fuere usado para tales alimentos. Al resolver que el fideicomitente debía pagar contribuciones sobre tal ingreso de conformidad con el art. 167, la corte dijo a las págs. 170–71: "Bajo una disposición de esta índole la *posibilidad* del uso del ingreso para relevar al fideicomitente, pro tanto, de su obligación de padre [de proveer alimentos] es

---

[14] El art. 154 prescribe en parte: "La administración de los bienes de los hijos que estén bajo la patria potestad pertenece, en primer término, al padre . . .". Cf. *Blanco* v. *Tribl. de Contribuciones*, supra, págs. 864–65.

suficiente para incluir todo el ingreso de estos fideicomisos en beneficio de menores dentro de la regla de atribución [al fideicomitente] establecida en *Douglas* v. *Willcutts* [296 U. S. 1]." (Bastardillas y corchetes nuestros.) ([15])

La sec. 20 (*h*) de nuestra Ley de Contribuciones sobre Ingresos—sec. 20 (*h*), Leyes de Puerto Rico, 1925, 13 L.P.R.A. sec. 699 (*h*)—fué copiada sustancialmente de la sec. 167 del Código Federal de Rentas Internas de 1924. Dispuso en su parte pertinente que "Cuando cualquier parte del ingreso de un fideicomiso puede ser . . . distribuída al cesionario . . . dicha parte del ingreso del fideicomiso deberá ser incluída, al computarse el ingreso neto del cesionario." La sec. 167 de la Ley Federal ha sido enmendada varias veces. Pero el caso de *Stuart* surgió bajo la sec. 167 cuando ésta virtualmente era idéntica a nuestra sec. 20 (*h*). Esta parte del caso de *Stuart* en consecuencia es de aplicación a casos que surjan bajo nuestra sec. 20 (*h*). ([16])

---

([15]) El caso de *Stuart* envolvía fideicomisos revocables. 317 U. S. a las págs. 158 y 159. Pero esta porción del caso se aplica también a fideicomisos irrevocables debido (1) al amplio lenguaje utilizado por el Tribunal Supremo y (2) al hecho de haberse resuelto que el ingreso de un fideicomiso es tributable al fideicomitente de acuerdo con la sec. 167 de la Ley Federal más bien que con la sección que trataba de fideicomisos revocables—la sec. 166, equivalente a nuestra sec. 20 (*g*). Paul, *Trusts and Federal Taxation*, 31 Taxes 608. El Congreso se dió cuenta de que esta porción del caso de *Stuart* se aplicaba a fideicomisos irrevocables. Los Comités de la Cámara y del Senado así lo manifestaron en sus informes recomendando se enmendara la sec. 167 que dejaba sin efecto esta porción del caso de *Stuart*. II Seidman, *Legislative History of Federal Income and Excess Profits Tax Laws*, págs. 2118–21; 6 Mertens, *Law of Federal Income Taxation*, pág. 528.

([16]) En 1943 el Congreso añadió un nuevo apartado (*c*) a la sec. 167 disponiendo que el ingreso de un fideicomiso no se considerará tributable al fideicomitente por el mero hecho de que dicho ingreso pueda aplicarse para alimentos de un beneficiario menor de edad excepto hasta el monto en que dicho ingreso sea de hecho así utilizado. Sec. 134 (*a*) de la Ley de Rentas Internas de 1943, 26 U.S.C.A. *Int. Rev. Acts* 458; II Seidman, supra, págs. 2118 y 2119. Pero la sec. 20 (*h*) de nuestra Ley permaneció en vigor desde 1924 hasta 1954, cuando la Asamblea Legislativa incorporó a nuestra Ley la enmienda Federal de 1943. Véase la sec. 167 de la Ley núm. 91, Leyes de Puerto Rico, 1954, conocida como la Ley de Contribuciones sobre Ingresos de 1954. Por consiguiente, esta parte del caso de *Stuart* es aplicable bajo la sec. 20 (*h*) de nuestra Ley, siempre que proceda, a ingresos de un fideicomiso entre 1924 y 1954.

En este caso el padre tenía el derecho tanto de determinar si el ingreso debía retirarse como el de administrarlo a tenor con el art. 154 del Código Civil; además, a él pertenece el usufructo de dicho ingreso bajo el art. 155. Bajo dichas circunstancias somos de opinión que el ingreso es atribuíble al padre-fideicomitente a tenor con la sec. 22 (h) de la Ley. El padre aquí ciertamente podía recibir tanta ventaja del fideicomiso como la que recibió el del caso de *Stuart* donde la única ventaja potencial que el padre tenía era la posibilidad, que nunca ocurrió, ([17]) de que el ingreso pudiera, *a discreción del fiduciario*, usarse para alimentos de sus hijos menores de edad. El caso de *Stuart*, particularmente según lo refuerza el de *Clifford* trae como resultado que el ingreso del fideicomiso en el caso de autos sea tributable al padre-fideicomitente de conformidad con la sec. 22 (h). ([18])

El caso de *Helvering* v. *Clifford*, supra, robustece nuestra conclusión de que el ingreso del fideicomiso aquí envuelto es

---

([17]) Igual que en el caso de *Stuart*, como cuestión de hecho los beneficiarios no retiraron ingreso alguno en este caso. El fiduciario retiró algún dinero del banco en que se habían depositado los cheques de dividendos y lo invirtió en hipotecas sobre bienes inmuebles de acuerdo con los términos del fideicomiso; el resto del dinero permaneció en el banco.

([18]) El problema que surgió debido a lo resuelto por el caso de *Stuart* a las págs. 169 a 171, desapareció de la Ley Federal cuando el Congreso lo "revocó legislativamente" en 1943. Véase el escolio 16. Nuestra Asamblea Legislativa no tomó acción sobre el asunto hasta el 1954, cuando sustituyó la sec. 20 (h) de nuestra Ley de 1924 con la sec. 167 de la Ley de Contribuciones sobre Ingresos de 1954, Ley núm. 91, Leyes de Puerto Rico, 1954. Nuestra sec. 167 (c) de 1954, redactada en lenguaje substancialmente similar a la enmienda federal de 1943 "revocando" el caso de *Stuart*, dispone que "el ingreso de un fideicomiso no será considerado tributable al fideicomitente . . . meramente porque dicho ingreso, a discreción . . . del fiduciario . . . pueda ser aplicado o distribuído para el sustento o mantenimiento de un beneficiario a quien el fideicomitente está legalmente obligado a sostener o mantener, excepto hasta el monto en que dicho ingreso sea así aplicado o distribuído." Pero nuestra sec. 167 (c) sólo se aplica a ingresos cubiertos por la Ley de 1954. Por tanto, dejamos para otra oportunidad las consecuencias que surgirían en esta jurisdicción de la "revocación legislativa" del caso de *Stuart*. Esto tendrá que considerarse junto con el problema *Clifford*. En cuanto al presente status de dicho caso, véase el escolio 20. *Cf.* 6 Mertens, supra, sec. 36.49, págs. 328–30; id., sec. 36.57, págs. 339–40. Y véanse los escolios 16 y 11.

tributable al fideicomitente. En dicho caso el Tribunal Supremo resolvió que el ingreso proveniente de un fideicomiso era tributable bajo la entonces sec. 22 (a) de la Ley Federal —nuestra sec. 15 (a), 13 L.P.R.A. sec. 694—aun cuando no fuera pagadera al propio fideicomitente y no se fuera a aplicar al pago de sus obligaciones legales, si él retenía el control del fideicomiso tan plenamente que todavía quedaba en efecto práctico como dueño del caudal objeto del fideicomiso. En *Helvering* v. *Stuart*, supra, a las págs. 168 a 169, la corte devolvió el caso en cuanto a uno de los fideicomisos allí envueltos para que el tribunal sentenciador determinara si la sec. 22 (a) Federal, interpretada conjuntamente con la sec. 167 Federal, hacía necesario que se atribuyera al fideicomitente el ingreso de este fideicomiso en particular. La inferencia era que la interrelación de estas dos secciones ". . . pudiera operar en el sentido de justificar una contribución [al fideicomitente] bajo la . . . sec. 167, aun cuando ésta no fuere aplicable en alguna otra forma." 2 P–H, *Federal Taxes*, 1955, pág. 15,150. Véanse *Mallinckrodt* v. *Nunan,* 146 F.2d 1 (C.A. 8, 1945), cert. denegado, 324 U. S. 871; *Emery* v. *Commissioner of Internal Revenue*, 156 F.2d 728 (C.A. 1, 1946). Cf. *Commissioner of Internal Revenue* v. *Bateman*, 127 F.2d 266 (C.A. 1, 1942). [19] De esto surge que en nuestro caso, aun si la sec. 20 (h) —nuestro equivalente de la sec. 167 Federal—no fuere suficiente, por sí sola, para hacer que el ingreso del fideicomiso sea atribuíble al fideicomitente, la sec. 15 (a) —copiada de la sec. 22 (a) Federal—al interpretarse conjuntamente con la sec. 20 (h), requeriría.

---

[19] Cf. *San Gerónimo Dev. Co.* v. *Treas. et al.*, 233 F.2d 126 (C.A. 1, 1956), a la pág. 133: ". . . el Tribunal Supremo de los Estados Unidos. muchas veces nos ha indicado, al rechazar interpretaciones literales de leyes contributivas basadas en 'sutilezas atenuadas', que la imposición de contribuciones 'es un asunto práctico' en el cual los tribunales no deben preocuparse mucho con los 'refinamientos de título'. Véase *Harrison* v. *Schaffner*, 312 U. S. 579, 581, 582 (1941). Véase además *Helvering* v. *Clifford*, 309 U. S. 331 (1940)."

Véase Kennedy, *Federal Income Taxation of Trusts and Estates*, Capítulo 6, págs. 558 *et seq.*; Sup. 1953. págs. 74 *et seq.*

ese resultado a tenor con los términos de este fideicomiso y a la luz de los arts. 154–55 del Código Civil y del caso de *Hernández*, aun en cuanto a ingresos que de hecho no han sido retirados por los beneficiarios. *Cf.* nuestra discusión del caso de *Clifford* según éste se aplica a los hechos del caso de *Juliá* a las págs. 540–41 de este último caso, a que ya nos hemos referido en la Parte I. [20]

El caso de *Hernández* v. *Tribunal de Contribuciones*, supra, surgió bajo diferentes artículos del Código Civil y no envolvía bienes poseídos en fideicomiso. Sin embargo, lo resuelto en dicho caso—que ingresos procedentes de bienes pertenecientes a menores son tributables a la sociedad de gananciales constituída por la madre y el padrastro—es enteramente compatible con la conclusión a que aquí llegamos.

[20] El caso de *Clifford* causó una gran inseguridad y considerables litigios. Véanse 6 Mertens, supra, sec. 37.17, pág. 472 *et seq.;* Paul, supra, págs. 613–15; Nota, 60 Yale L. J. 1426. En su consecuencia, el Comisionado Federal promulgó el llamado Reglamento Clifford. 26 *Code of Federal Regulations*, sec 29.22 (a)–21, 22 (1949); 6 Mertens, supra, págs. 484–92; Guterman, *Federal Income Taxation of Inter Vivos Trusts, 9th Annual Institute on Federal Taxation*, N.Y.U., 183; Cleary, *The Clifford Regulations Reexamined*, 12 id., pág. 741. Posteriormente, en 1954, el Congreso incorporó mucha de esta reglamentación a la Ley Federal; y dispuso además que la sec. 61 de la Ley Federal de 1954, imagen de la anterior sec. 22 (a) Federal, equivalente a nuestra sec. 15 (a), en adelante no jugaría papel alguno en la cuestión ante nos. Secciones 671–78, *Federal Internal Revenue Code of 1954;* Mertens, *Code Commentary*, por Zimet *et al.*, secs. 671–78, págs. 58–72; Kamin, Surrey y Warren, *The Internal Revenue Code of 1954: Trusts, Estates and Beneficiaries*, 54 Col. L. Rev. 1237, 1259–64; Craven, *Taxation of Estate and Trust Income under the 1954 Code*, 103 U. Pa. L. Rev. 602, 621–28; Holland, Kennedy, Surrey y Warren, *A Proposed Revision of the Federal Income Tax Treatment of Trusts and Estates—American Law Institute Draft*, 53 Col. L. Rev. 316, 358–67; Murray, *Income Taxation of Short-Term and Controlled Trusts, 1955 Tax Institute*, U.S.C. Law School Tax Institute, 497; Greenberger, *Changes in the Income Taxation of Clifford Type Trusts, 13th Annual Institute on Federal Taxation*, N.Y.U., 165. Véanse Rice, *Judicial Trends in Gratuitous Assignments to Avoid Federal Income Taxes*, 64 Yale L.J. 991; Pedrick, *Familiar Obligations and Federal Taxation: A Modest Suggestion*, 51 N.W.U L. Rev. 53.

En Puerto Rico solamente tenemos la guía—o la inseguridad, según algunos—del caso de *Clifford* y otros relacionados. No tenemos reglamento o disposiciones estatutarias—ni aún en la Ley de 1954—en cuanto al efecto de la anterior sec. 15 (a), que es ahora la 22 (a), sobre la cuestión de si el ingreso de un fideicomiso es atribuíble al fideicomitente.

Además, en el caso de *Juliá* este Tribunal a la pág. 534 implícitamente aceptó el razonamiento del tribunal sentenciador al efecto de que el 25% del ingreso del fideicomiso pagadero a los beneficiarios menores de edad era tributable a su padre, el fideicomitente. ([21])

 Resta por considerar el art. 225 del Reglamento núm. 1, copiado sustancialmente del Reglamento Federal de aquella época, que dispone en parte: "Si un menor ha sido emancipado por su padre, el producto de su trabajo constituye su propio ingreso y no es necesario incluir tales entradas, independientemente de la cantidad, en la planilla del padre. Si la totalidad del ingreso neto de un menor proveniente de cualesquiera bienes que posea, y de cualquier fondo depositado en fideicomiso para él con un fiduciario o tutor, y del producto de su trabajo en caso de habérsele emancipado, asciende por lo menos a $1,000, o su ingreso bruto a $5,000 por lo menos, bien él o su tutor, u otra persona encargada de su persona o bienes para él deberá radicar una planilla como en el caso de cualquier otro individuo. Véase el art. 231. En ausencia de prueba en contrario, se presumirá que un padre tiene el derecho legal al producto del trabajo del menor y debe incluirlo en su planilla."

La segunda oración de la porción antes copiada es inválida en vista del resultado a que llegamos en este caso y en el de *Hernández*. Así debimos haberlo dicho en dicho caso en lugar de descansar como lo hicimos a la pág. 719 en la presunción contenida en la última oración del art. 225, que se aplica sólo a ingreso producto del trabajo y no a ingreso que no es tal producto. Véanse 8 Mertens, *Law of Federal In-*

---

([21]) La contención del gobierno en el caso de *Juliá*, en cuanto a que el interés no era deducible, falló porque las enmiendas hechas a nuestra Ley con anterioridad al 1954 no habían llevado el mismo ritmo de las enmiendas Federales declarando no deducibles los pagos de intereses a fiduciarios bajo ciertas circunstancias. *Cf.* secs. 24(*c*) (3) y 24(*b*) (2) (A) de nuestra Ley de Contribuciones sobre Ingresos de 1954.

*come Taxation*, sec. 47.12, págs. 560–61; id., Sup. 1955, pág. 228. *Cf.* arts. 201 y 207 del Reglamento núm. 1.(²²)

En algún otro caso un padre podría concebiblemente constituir un fideicomiso válido en beneficio de sus hijos menores de edad que pueda traer como resultado una reducción en las contribuciones sobre ingresos que la familia en conjunto viniera obligada a pagar. Corresponde a la Asamblea Legislativa y no a este Tribunal determinar si ésa es una política sabia.

*Por los motivos expuestos, la anterior opinión de la mayoría publicada en 78 D.P.R. 412, será dejada sin efecto y sustituída por ésta. La moción para que se reconsidere la sentencia dictada será declarada sin lugar.*

Los Jueces Asociados señores Negrón Fernández y Belaval concurrieron en el resultado por los motivos expuestos en la opinión concurrente emitida en el día de hoy por el Juez Asociado señor Belaval.

El Juez Asociado señor Marrero, aun cuando no estuvo presente cuando se firmaron la opinión y esta resolución, participó en la discusión de la moción y está de acuerdo con la opinión del Tribunal.

El Juez Asociado señor Saldaña no intervino.

---

Opinión concurrente del Juez Asociado señor Belaval con la cual está conforme el Juez Asociado señor Negrón Fernández.

EN RECONSIDERACION

La opinión de la mayoría en reconsideración ha creído necesario rectificar el extremo de nuestra decisión anterior, en la que resolvimos, que en Puerto Rico no se puede constituir un fideicomiso *inter vivos* por un padre a favor de dos hijos de doce y nueve años de edad, que vivan en compañía

---

(²²) Es interesante indicar que la Asamblea Legislativa dispuso lo siguiente en la sec. 22(*m*)(1) de la Ley de Contribuciones sobre Ingresos de 1954: "Cantidades recibidas por concepto de servicios de un menor serán incluídas en su ingreso bruto y no en el ingreso bruto de los padres, aun cuando dichas cantidades no sean recibidas por el menor."

de sus padres, porque el Código Civil de Puerto Rico no permite las correspondientes renuncias de los deberes paternos en cuanto a la administración, representación y enajenación de bienes de hijos menores, ni reconoce, la separabilidad de bienes o utilidades entre hijos menores de edad que vivan en compañía de sus padres y dichos padres, cuando tales bienes provengan del caudal de los padres.

La única dificultad en este caso es que los estudiosos de nuestro Derecho, no quieren enfrentarse con el problema, en la forma en que hay que hacerlo, partiendo de las siguientes proposiciones ineluctables: (1) el fideicomiso puertorriqueño no es igual al fideicomiso anglosajón; (2) existe una diferencia fundamental entre un fideicomiso testamentario y un fideicomiso *inter vivos* de acuerdo con nuestro Derecho Civil; (3) el fideicomiso puertorriqueño es una institución civil más dentro de nuestro sistema civil codificado.

La mejor referencia que tenemos sobre la intención de la Legislatura de Puerto Rico al adoptar el fideicomiso panameño, es una carta que le escribió el Lic. Miguel Guerra Mondragón, vicepresidente de nuestra Cámara de Representantes y autor del proyecto, a su compañero el Lic. Benicio Sánchez Castaño, recogida en la glosa del señor Ruford G. Patton titulada: "Los Sistemas Fideicomisarios en el Hemisferio Occidental"—XIX Tulane L. Rev. 398, cita precisa a la página 319, donde el Lic. Guerra Mondragón informa, que el representante de un banco local, (el American Colonial Bank), le facilitó un número del Boletín de la Unión Panamericana, en el cual aparecía un artículo del doctor Alfaro, por aquel tiempo Ministro de Panamá en Washington, sobre el *trust* anglosajón; que dicho artículo lo convenció de la necesidad de legislar autorizando la creación de fideicomisos, porque el albaceazgo provisto por nuestro Código civil, no contenía las ventajas ni las garantías que el suprimido "Consejo de Familia", proveía; que el albacea podía morir, podía viajar, podía enfermarse, podía abandonar los intereses confiados a él, o podía incluso administrar mal las propiedades

de la herencia en perjuicio de los instituídos; que, por el contrario, las compañías fiduciarias no se enfermaban, ni viajaban, ni descuidaban los intereses de sus clientes, y que esto era cierto, si no por razones de honestidad, por lo menos por razones de negocios; que por esta razón, "aquellos de nosotros que votamos por la aprobación de dichas leyes de 1928, teníamos en mente las ventajas de las instituciones cuasi-bancarias sobre una persona como albacea".

Veamos ahora qué fué lo que sucedió en Panamá. Habiéndose confrontado al doctor Ricardo J. Alfaro, en la práctica de su profesión, con algunos problemas referentes a la administración en vida, y a la conservación después de la muerte, de ciertos patrimonios, para los cuales no ofrecía solución el Derecho civil panameño, y habiendo descubierto que parte de esos problemas estaban resueltos por los principios del *trust* anglosajón, el doctor Alfaro se puso a investigar la posibilidad de adoptar ciertos principios del *trust* anglosajón al Derecho civil. Es bueno enumerar los problemas, que de acuerdo con el criterio del doctor Alfaro, no tenían solución en el Derecho civil panameño: (1) una persona que deseaba obtener un préstamo considerable y quería dar en garantía del préstamo, un establecimiento industrial o comercial, en pleno funcionamiento, y sus productos; (2) tres hermanos que querían renunciar una herencia sobre un bien inmueble a favor de un hermano, con una tendencia marcadísima a la prodigalidad; (3) un caballero de edad madura, casado con una mujer muy joven y muy bella, con la cual tenía dos hijos, a quienes deseaba transmitir su herencia, pero que le preocupaba grandemente la suerte que el patrimonio pudiera correr después de su muerte, si su mujer contraía segundas nupcias; (4) una mujer casada que no deseaba dar a su marido la administración de sus bienes privativos, pero al cual no deseaba humillar nombrando un mandatario o administrando ella directamente su patrimonio privativo; (5) un padre que deseaba entregar a su hija casadera determinados bienes dotales o parafernales, pero

excluyendo a su yerno de la administración; (6) un donante o testador que deseaba asegurar el patrimonio que donaba, legaba o trasmitía contra el evento de una administración negligente, aventurada o pródiga; (7) un deudor acosado por sus acreedores, que no deseaba entregar a éstos sus bienes para no destruir su crédito, ni poner fin a sus negocios y quedar sometido a un concurso de acreedores; (8) un deudor con suficientes bienes para pagar a sus acreedores que deseaba celebrar un contrato de anticresis, pero los acreedores no se ponían de acuerdo entre sí, con respecto a cuál de entre ellos, debía administrar los bienes; (9) la pignoración de valores negociables; (10) la emisión de bonos, cédulas u otros valores bursátiles en cantidades considerables; (11) otras operaciones que versaban al mismo tiempo sobre bienes muebles o inmuebles o sobre derechos reales y personales. Vide: Alfaro—Adaptación del *Trust* del Derecho Anglosajón al Derecho Civil, págs. 10–16—(ed. de la Academia Interamericana de Derecho Comparado e Internacional de 1948).

Examinadas en sus orígenes las instituciones del derecho romano que se conocen como "fideicomiso de herencia" y "fideicomiso de residuo"; y contrastadas con la disposición de "propiedad fiduciaria" del Código de Andrés Bello, las disposiciones sobre "substituciones fideicomisarias" de los códigos europeos y el *trust* anglosajón, el doctor Alfaro encuentra una mejor solución de continuidad entre el clásico fideicomiso romano y el *trust* anglosajón. La única diferencia esencial entre el clásico fideicomiso romano y el *trust* anglosajón, es que el clásico fideicomiso romano era una institución puramente testamentaria, mientras que el *trust* anglosajón es un acto *inter vivos*.

Examinadas las circunstancias que determinaron la proscripción del clásico fideicomiso romano y su reemplazo por las substituciones fideicomisarias, el doctor Alfaro prepara su proyecto-modelo, no siguiendo las líneas generales del *trust* anglosajón como aquí se ha entendido, sino modernizando el clásico fideicomiso romano, en cuanto a disposición por he-

rencia se refiere, y siguiendo las inducciones del Código de Andrés Bello sobre propiedad fiduciaria, en cuanto a disposición por actos *inter vivos* se refiere. Solo teniendo esto claramente dilucidado, se puede interpretar correctamente el texto del proyecto-modelo del doctor Alfaro.

Algunos críticos son de opinión que la nueva institución ha debido denominarse "propiedad fiduciaria" o "negocio fiduciario" fiducia en vez de fideicomiso. En efecto, en la modalidad del proyecto-modelo referente a fideicomisos *inter vivos*, hubiera sido más acertado modernizar algunas de las formas del *"fiducia cum amico contracta"* y *"fiducia cum creditore contracta"*: véase I. J. Arias Ramos, Derecho Romano 421 y 422, (sexta edición de la Editorial Revista de Derecho Privado de 1954). No obstante, tenemos que aceptar, que la verdadera dificultad con que se tropezó el doctor Alfaro fué diseñar una institución que lo mismo sirviera como substitución fideicomisaria que como fideicomiso *inter vivos*. Como es sabido la "fiducia", en puro derecho romano, es fundamentalmente un derecho real de garantía.

El experimento de Panamá, inducido por el Doctor Alfaro, podría sintetizarse de la siguiente forma: puesto a escoger entre las substituciones fideicomisarias—tal como las reconoce el Código Civil de España y el Código Civil de Puerto Rico—y el clásico fideicomiso sucesorio romano, Panamá se resuelve por el clásico fideicomiso romano, descartando de él los aspectos vinculatorios que produjeron su descrédito y su reemplazo por las substituciones fideicomisarias; una vez escogida dicha institución en vez de mantenerla en su esfera tradicional románica de institución sucesoria, la amplía a actos *inter vivos* para hacerla coincidir con algunos aspectos del *trust* anglosajón.

Ahora bien, esto pudo hacerse así en Panamá, porque Panamá es un pueblo donde existe absoluta libertad de testar, no existe un régimen de legítimas, no se reconocen las substituciones fideicomisarias por testamento, ni la interdicción por prodigalidad, al revés que en Puerto Rico, donde no existe

absoluta libertad de testar, existe un régimen de legítimas, se reconocen las substituciones fideicomisarias por testamento —arts. 703–718 del Código Civil de Puerto Rico—, y la tutela por prodigalidad—art. 187 del mismo código—, puede ser diferida por testamento, si el instituído ha sido declarado pródigo en un momento anterior. En este último caso, el anterior tutor del pródigo interviene únicamente a los efectos de aceptar la herencia y el tutor testamentario sigue después desempeñando su tutela, dentro de los límites correspondientes al diferimiento, según la clase de heredero o legatario de que se trate, pero siempre teniendo en cuenta la preferencia a favor del tutor testamentario: art. 175 del Código Civil de Puerto Rico (1930).

Estas diferencias son las que obligaron a los legisladores puertorriqueños a ciertas enmiendas, de carácter bastante drástico. En la glosa del señor Patton que antes acotamos, se informa, que los viejos abogados civilistas de la Legislatura estaban alarmados con la nueva institución, temiendo que la misma fuera a alterar el sistema hereditario de Puerto Rico. Para evitar esto—comenta Patton—se incluyó una disposición en el sentido "que nada de lo contenido en esta ley se entenderá que derogue o modifique el sistema hereditario establecido por el Código Civil de Puerto Rico". Además, aunque el señor Patton no habla de ello, también se añadió en el art. 13 otra disposición, en el sentido, que "quedan prohibidos y son igualmente nulos los fideicomisos constituídos con perjuicio o menoscabo de la legítima correspondiente a herederos forzosos, según lo preceptuado en el vigente Código Civil de Puerto Rico".

El efecto de estas enmiendas, en cuanto a los aspectos puramente testamentarios, del fideicomiso que adoptamos del modelo panameño, es que prácticamente anularon todos sus efectos, puesto que dejaron vigentes tanto las substituciones fideicomisarias como el régimen de legítimas. Posiblemente la única innovación consiste en que el albaceazgo o la administración de los bienes de un finado, que antes tenía que

hacerse por una persona particular, puede hacerse ahora por instituciones fiduciarias. Esto se ve más claro cuando se examinan las disposiciones de la Ley núm. 40 de 23 de abril de 1928, titulada "Ley para disponer la incorporación y reglamentación de Compañía de Fideicomisos y para otros fines", que resulta una ley *in pari materia.* Solo así adquieren plena significación las palabras del autor del proyecto de ley el Lic. Miguel Guerra Mondragón, en el sentido, que *"aquellos de nosotros que votamos por la aprobación de dichas leyes de 1928, teníamos en mente las ventajas de las instituciones cuasi-bancarias sobre una persona como albacea".*

Por eso, los países donde mejor ha funcionado el fideicomiso romano en su forma moderna, o el *trust* anglosajón consagrado por la jurisprudencia pragmática, son todos países donde existe la absoluta libertad de testar: Inglaterra, *Estados Unidos de América,* con excepción del estado de Luisiana, Canadá, Méjico, Costa Rica, Honduras, *Panamá,* Nicaragua, San Salvador y Guatemala: 6 Manresa Comentarios al Código Civil Español 289, (séptima ed. del Instituto Editorial Reus de 1951) y en países donde no existen las substituciones fideicomisarias: Inglaterra, Estados Unidos de América, Canadá y Panamá.

Esto en cuanto a los fideicomisos testamentarios. Veamos ahora, cual es la situación en cuanto a los fideicomisos *inter vivos.*

La diferencia fundamental que existe entre un fideicomiso testamentario y un fideicomiso *inter vivos* en beneficio de tercero, es la diferencia que existe entre un testamento y un contrato. El único indicio de intención legislativa que tenemos es que en esta modalidad, lo mismo que en la modalidad testamentaria, nuestro fideicomiso siguió el modelo panameño. Esto nos obliga a examinar la tesis panameña sobre el particular. Oigamos lo que al respecto nos dice el Doctor Alfaro, sin duda alguna, primera autoridad en todo lo relacionado con el fideicomiso panameño.

"¿Cómo debe clasificarse el *trust* en el derecho civil? ¿Debe considerársele como contrato, como acto unilateral, como obligación o como un derecho real o personal del beneficiario?

"Los autores angloamericanos han designado promiscuamente el *trust* como 'una confianza' (*confidence*); como 'tenencia de bienes' (*a holding of properties*); como 'derecho de dominio' (*a right of property*); como un 'derecho, título o interés en equidad sobre ciertos bienes' (*an equitable right, title or interest in property*); y por último, como 'una obligación' (*an obligation*). La reciente ley del Estado de Luisiana, siguiendo los términos de la definición formulada por el Instituto Jurídico Americano (*American Law Institute*) llama al *trust* "una relación fiduciaria" (*a fiduciary relationship*) y el expositor Lepaulle, tras un minucioso análisis, lo denomina simplemente 'institución jurídica' que consta de dos elementos: un patrimonio y una destinación (*affectation*)...

"Teniendo en cuenta que la causa determinante del *trust* es la voluntad del constituyente, la tendencia a considerarlo como un acto unilateral de la naturaleza de un testamento o de una donación, es del todo natural en la mentalidad latina. Sin embargo, un *trust* como el que crea la ley de Luisiana, *o un fideicomiso como el que concibe la ley panameña, presenta en general las características de un contrato que crea derechos y obligaciones entre las tres partes que entran en él.*

"En primer lugar, la existencia legal del fideicomiso comienza cuando el fiduciario acepta el encargo. Así lo estatuyen la ley de Panamá y la ley de Luisiana. Mediante tal aceptación *asume él para con el constituyente si está vivo*, la obligación de dar cumplimiento a su encargo, y para con el beneficiario, la obligación de hacer o darle las cosas dispuestas en beneficio suyo, no sólo por el instrumento de fideicomiso, sino también por la ley. Varios artículos de las leyes panameña y puertorriqueña establecen la manera como el fiduciario debe desempeñar sus funciones y manejar los bienes fideicometidos. Pero el fiduciario no tiene únicamente obli-

gaciones. Adquiere también derechos, como por ejemplo, el de recibir retribución por su trabajo, salvo que haya estipulado lo contrario. El beneficiario a su turno adquiere el derecho de recibir el beneficio dispuesto en favor suyo. La Ley le da además, ya explícita ya implícitamente, el derecho de ejercer todas las acciones precautorias, conservatorias o de fondo, especiales u ordinarias, reales o personales, que sean necesarias para hacer efectiva la ejecución del fideicomiso. Por lo que hace al constituyente, parecería a primera vista que una vez trasmitidos los bienes por él al fiduciario, su figura desaparece del cuadro y que no retiene ningún derecho. Cuando el fideicomiso se extingue por ciertas causas, los bienes que tenga el fiduciario en su poder volverán al dominio del constituyente lo que significa que éste tiene el derecho de reivindicarlos del fiduciario . . . .

"Mi conclusión es, por lo tanto, que si bien es difícil clasificar el *trust* angloamericano mediante una sola fórmula del derecho civil, el fideicomiso, de acuerdo con el criterio jurídico más preponderante, presenta en general las características de un contrato que crea entre las partes derechos y obligaciones recíprocos. Estas características son más o menos fuertes, según los fines para los cuales se constituye el fideicomiso": Alfaro—obra y edición citadas—39–41.

Como se ve, al incorporarse al Derecho panameño algunos de los principios del *trust* anglosajón, no se hizo como una institución civil independiente que no guardara relación con el resto del sistema civil, sino como una institución civil más dentro del ordenamiento civil. Esto transluce de un extremo a otro en la monografía del doctor Alfaro. Además, invariablemente, es la política que se sigue en un pueblo regido por un sistema civil. La diferencia que existe entre incorporar una institución de derecho en un pueblo con un sistema civil e incorporarla en un pueblo sin un sistema civil, estriba, que en el primer caso, no se deja la institución flotando en el aire, como algo nuevo, foráneo y antagónico al sistema secular, mientras que en el segundo caso. la institución puede subsistir

con absoluta independencia del resto de la costumbre y la jurisprudencia, por no existir un cuerpo orgánico de principios que regule generalmente todo el orden jurídico del país. Como el fideicomiso panameño que tomamos como modelo, fué diseñado para engranar dentro de un sistema civil, sin alterar nuestro orden civil general, podemos utilizarlo en su modalidad de fideicomiso *inter vivos* a beneficio de tercero, como un contrato típico más, al igual que la prenda, el depósito, la anticresis y la hipoteca, en una variedad de casos, si lo entendemos bien, no perdemos la cabeza y no tratamos de adulterarlo dentro de las formas atípicas e innominadas del *trust* anglosajón. Los casos ejemplares comentados por el doctor Alfaro en su interesante monografía, que se refieren al fideicomiso *inter vivos*, son buenos indicadores de su potencialidad como tal contrato.

En cuanto a Puerto Rico se refiere, no hay duda de la intención legislativa de incorporar el fideicomiso a nuestro Código civil, como una institución civil más, sujeta a todas las disposiciones de nuestro Código. El inciso (1) del art. 9 de la Ley núm. 48 de 28 de abril de 1930, que dispone: "quedan además incluídas en este Código todas las disposiciones de las siguientes leyes que están hoy fuera del mismo y han sido incorporadas en él por la Comisión codificadora . . . (1) Ley para proveer la constitución de fideicomisos y para otros fines de 23 de abril de 1928 . . ." y la disposición final del Código Civil de Puerto Rico de 1930 establece: "quedan derogados y sin fuerza ni vigor el Código civil y todas las demás leyes o cuerpos legales *que directa o indirectamente se opongan a las disposiciones del presente Código* civil revisado, así en su concepto de leyes directamente obligatorias, como en el de derecho supletorio. Esta disposición no es aplicable a las leyes que en este Código revisado se declaran subsistentes", no deja lugar a dudas que se trata de un caso de derecho codificado y no de derecho compilado, o de derecho particular aplicable a una clase, o de derecho especial aplicable a una materia no comprendida en el Código. Como se sabe, todo el

articulado de un Código civil forma un cuerpo homogéneo, concordado, que se complementa a sí mismo, y no se contradice en sus diversas instituciones, y su arquitectura racional está concebida dentro de la unidad y no dentro de la diversidad doctrinal. Sólo así adquiere pleno sentido la disposición del art. 855 que establece: "el fideicomitente puede crear el fideicomiso en cualquier forma, para cualquier fin y bajo cualesquiera términos y condiciones que no infrinjan la *ley* o la moral pública o que no se prohiban específicamente en este Código . . . ." Claro, que esto pudo hacerse así en Puerto Rico por el trabajo previo que habían hecho los juristas panameños, especialmente el doctor Alfaro, al adaptar algunos de los principios del *trust* anglosajón a un sistema civil codificado.

Pero hay otro criterio más determinativo para concluir que los artículos de nuestro Código Civil, referentes al fideicomiso, forman parte de nuestro sistema civil codificado: la concordancia: Nótese la concordancia que existe entre el art. 834, referente al fideicomiso y los arts. 1600 y 1605, referentes al mandato; entre el art. 835, referente al fideicomiso, y los arts. 560, 582 y 586, referentes a donaciones *inter vivos* y los arts. 616 y 620, referentes al testamento y el art. 703, referente a substituciones fideicomisarias; entre el art. 838, referente al fideicomiso, y el art. 575, referente a donaciones y el art. 1181, referente a la fecha del documento privado; entre el art. 839, referente al fideicomiso, y los arts. 1068, 1070, 1071 y 1078, referentes a las obligaciones condicionales, a día cierto, etc.; entre el art. 840, referente al fideicomiso, y los arts. 398 y 1207, referentes a las cláusulas y condiciones permisibles en un contrato; entre el art. 841, referente al fideicomiso, y el art. 443, referente al término del usufructo; entre el art. 842, referente al fideicomiso, y los arts. 396, 451 y 454, referentes al uso y habitación y el art. 716, referente a substituciones fideicomisarias; entre el art. 843, referente al fideicomiso, y el art. 713, referente a substituciones fideicomisarias; entre el art. 845, referente al fideicomiso y, los

arts. 569 y 586, referentes a reducción de donaciones por sobrevivencia o superveniencia de hijos y los arts. 710 y 711, referentes a substituciones fideicomisarias y el art. 914, referente a hijos póstumos; entre el art. 846, referente al fideicomiso, y los arts. 710 y 711, referentes a substituciones fideicomisarias; entre el art. 847, referente al fideicomiso, y los arts. 676 y 685, referentes a las incapacidades para suceder; entre el art. 848, referente al fideicomiso, y el art. 443, referente al usufructo; entre el art. 849, referente al fideicomiso, y el art. 1609, referente al mandato; entre el art. 851, referente al fideicomiso, y el art. 216, referente a tutelas y el art. 1602 referente al mandato; el art. 852, referente al fideicomiso, y el art. 217, referente a tutelas y el art. 1625, referente al mandato; entre el art. 855, referente al fideicomiso, y el art. 814, referente a las cláusulas y condiciones permisibles en un contrato; entre el art. 857, referente al fideicomiso, y el art. 703, referente a substituciones fideicomisarias; entre el art. 859, referente al fideicomiso, y el art. 195, referente a tutela; entre el art. 860, referente al fideicomiso, y el art. 175, referente a tutela; entre el art. 861, referente al fideicomiso, y el art. 821, referente a tutela; entre el art. 862, referente al fideicomiso, y el art. 220, referente a tutelas y entre el art. 865, referente al fideicomiso, y el art. 212, referente a tutela. Esto, claro es, no pasa de ser lo que podría llamarse una concordancia gruesa, de las cosas más obvias, donde la similitud resalta a simple vista. Si fuéramos a hacer uso de un método más fenomenológico, podría afirmarse categóricamente, que entre las instituciones civiles del mandato, de la donación, de la tutela, del usufructo, de las substituciones fideicomisarias, y del fideicomiso, propiamente entendido, hay tal identidad en las esencias, que no tendría que establecerse ninguna de las similitudes por mera deducción.

Claro debe ser ahora, que siempre que nos tropecemos con un problema jurídico referente a fideicomisos, estamos ante un caso de puro Derecho civil puertorriqueño.

Ahora bien, hemos dicho que la diferencia que hay entre un fideicomiso *mortis causa* y un fideicomiso *inter vivos*, es la diferencia que hay entre un testamento y un contrato. El fideicomiso *inter vivos* cuando no es a favor del propio fideicomitente, es un contrato a beneficio de tercero. Cualquiera duda sobre el particular nos la resuelve expresamente el art. 834, al disponer que: "el fideicomiso es mandato irrevocable a virtud del cual se trasmiten determinados bienes a una persona llamada fiduciario para que disponga · de ellos conforme lo ordena la que los trasmite llamada fideicomitente a beneficio . . . de un tercero, llamado fideicomisario". Siendo una obligación a beneficio de tercero, la misma no queda perfeccionada sin la aceptación del beneficiario: art. 1209 del Código Civil de Puerto Rico.

La confusión, en el sentido, que el tercero no tiene que aceptar la obligación establecida a su beneficio, para que ésta quede perfeccionada, parece originarse en la creencia, que en el Código Civil de Puerto Rico existe, como en otros códigos, un capítulo aparte de la policitación, dedicado a la declaración unilateral de la voluntad en actos *inter vivos*, donde están incluídas las ofertas al público, las estipulaciones en favor de tercero y la obligación en documentos civiles a la orden y al portador. De ser aplicable esta permisibilidad genérica a un contrato civil de partes nominadas, que a mi juicio no lo es, todavía habría que disponer de la cuestión que en Puerto Rico no existe tal capítulo en nuestro Código Civil, sino que existe en dicho Código la expresa declaración, que las obligaciones a beneficio de tercero no se perfeccionarán hasta que el contrato sea aceptado por el beneficiario, lo cual resulta mucho más racional y jurídico.

Las excepciones a esta regla general son las obligaciones a beneficio de un tercero innominado o genérico y casi todas están expresamente autorizadas por ley. Véase, por ejemplo, la Ley núm. 33 de 7 de marzo de 1912, enmendando el art. 153 de la Ley Hipotecaria y el art. 132 del Reglamento para la Ejecución de la Ley Hipotecaria, que en la parte pertinente

a este estudio, dispone: "tales obligaciones podrán ser constituídas por el dueño de una finca o derecho, sin determinación específica del nombre del acreedor, otorgándolas genéricamente a la orden de la persona a cuyo favor puedan ser transferidos o endosados los títulos quirografarios por el hipotecante" y la disposición correspondiente a las pólizas de grupo sobre la vida o salud de una persona o contra daño o inhabilitación física por accidentes de nuestra Ley de Seguros de 1921. En esta misma forma quedarían incluídos los fideicomisos para fines no pecuniarios, especie de mandas para establecimientos de caridad o de beneficencia, autorizadas tanto por nuestro sistema de substituciones fideicomisarias, como por los propios artículos referentes al fideicomiso, según enmendados.

La opinión de la mayoría, en reconsideración, cree encontrar apoyo para su conclusión de que el tercero beneficiario no tiene que aceptar el fideicomiso para que el mismo quede perfeccionado, en nuestra anterior jurisprudencia basada en la disposición del art. 849 de nuestro Código, que establece: "la vida legal de un fideicomiso comienza desde que el fiduciario acepta el mandato, con lo cual se hace irrevocable". No se trata de ningún principio nuevo en Derecho civil. El mandatario, llámese apoderado o fiduciario, queda obligado por la aceptación a cumplir el mandato, y responde de los daños y perjuicios que de no ejecutarlo se ocasionan al mandante—art. 1609 del Código civil—pero esto no significa, que por la mera aceptación del mandato, que es una relación interindividual entre dos personas para fines de pura administración o custodia, quedan obligadas otras personas ajenas a dicha relación; el tutor encargado de administrar un legado dejado a un menor tiene que aceptar el cargo y aún inscribirlo en el Registro de Tutelas,—art. 175 del Código civil—pero dicha aceptación no surte efecto en cuanto al menor, hasta que el legado haya sido aceptado por el padre, la madre o el tutor general; el albacea testamentario tiene que aceptar el albaceazgo, a menos que no se excuse dentro de los seis días

siguientes a aquél en que tenga noticia de su nombramiento —art. 820 del Código Civil—pero esto no significa, que los herederos queden sujetos a las condiciones y cargas de una herencia, hasta que los herederos la acepten por su cuenta. De manera pues, que esta aceptación por el fiduciario, en nuestro actual estado de Derecho, cuando se trate de un fideicomiso *inter vivos*, sólo significa una relación interindividual de naturaleza administrativa, que no obliga al tercero beneficiario a menos que éste lo acepte.

Si lo que se pretende en el fideicomiso *inter vivos* a beneficio de tercero, es la individualización de un patrimonio, como algo distinto y separado al patrimonio del constituyente, la única forma de lograrlo es mediante la aprobación expresa del tercero beneficiario. Tampoco crearía la individualización del patrimonio, que es lo que se persigue, el hecho que el fiduciario tenga todos o algunos de los derechos y acciones correspondientes al pleno dominio:—arts. 865 y 866 de nuestro Código Civil. —En igual condición está el mandatario con poder general o poder especial, y el tutor testamentario o el heredero substituyente, según los términos del testamento. Además en el fideicomiso no se da el caso de irreversibilidad absoluta que supone la transmisión en pleno dominio.—Hubiera bastado una simple ojeada al articulado de nuestro Código, correspondiente al fideicomiso, para descartar una idea tan frágil como peligrosa.

En la actual opinión de la mayoría se hace el esfuerzo de injertar la teoría anglosajona de la divisibilidad del título, en título legal y propiedad en equidad. Esta es la peor forma de resolver la cuestión, puesto que, no sólo tal cosa no existe en Derecho civil, sino que además sería contraria a la propia teoría de la transmisión del dominio al fiduciario, según nos hace ver el propio doctor Alfaro—págs. 52–55 de la obra citada—requisito *sine qua non* para la individualización del patrimonio a favor de un tercero, en aquellos países en que no se necesita la aceptación del beneficiario para que quede

perfeccionada una obligación a su favor, cosa que según hemos visto, no ocurre en Puerto Rico.

Pero aún asumiendo, que por la mera aceptación del fiduciario, quedara perfeccionado el fideicomiso *inter vivos* a beneficio de tercero, todavía tendríamos que indagar, si la transmisión de bienes resulta una no prohibida expresamente por nuestro Código, puesto que nuestro Código expresamente establece en su art. 855, que el fideicomitente puede crear el fideicomiso en cualquier forma para cualquier fin y bajo cualesquiera términos o condiciones que no resulten contrarias a la *ley* o que no se prohiban específicamente en este Código.

Sabido es que el *trust* anglosajón se ha utilizado para regular toda clase de relaciones familiares, precisamente, porque no existe la limitación en cuanto a la forma de testar ni en cuanto a la forma de organizar el orden interno de la familia. En este sentido, el Derecho anglosajón está todavía contaminado por una serie de rémoras feudales, tomadas en sus orígenes, del estado que prevalecía en el Derecho romano durante la conquista de los normandos. Por el contrario, nuestro Código Civil es producto del complejo liberal en cuanto a relaciones de familia y relaciones con la propiedad, característico del Siglo XIX, siglo anatómicamente revolucionario y esencialmente inspirado en el estatismo, al que le correspondió la misión histórica de liquidar todas las prerrogativas y privilegios de una sociedad nobiliaria, en la cual, la libertad de disponer de cualquier patrimonio era absoluta y la voluntad del padre suficiente para organizar todo el orden interno de la familia.

En los Códigos civiles europeos del siglo XIX, todas estas instituciones paterno-filiales de origen nobiliario, se transforman en instituciones de Derecho público, que le son impuestas al padre como verdaderas obligaciones y no como derechos. Como afirma Puig Peña, al referirse a la patria potestad: "un principio general y rector de la institución domina en toda la materia y es que la patria potestad ha de concebirse y ejecutarse como una función que el Estado reco-

noce en los padres respecto de los hijos, en beneficio de éstos"
siendo pues caracteres de la patria potestad los siguientes
"(*a*) constituye, ante todo, *un deber u obligación que no puede*
ser objeto de excusa [ni renunciada] puesto que está asig-
nada a los padres en virtud de los supremos principios de la
moral familiar y razón social del Estado, que la articula en
ellos como sujetos a quienes corresponden con exclusividad;
(*b*) *esta obligación es de carácter personal* no pudiendo ser
realizada a través de un tercero ... (*c*) además *es intransfe-
rible;* no puede el padre transmitir a un tercero en bloque la
patria potestad que ejerce sobre sus hijos ....; (*d*) final-
mente representa una obligación positiva de tracto conti-
nuado, que exige y requiere el despliegue eficaz y constante
de una conducta de cumplimiento suficiente para llenar el
cometido propio de la patria potestad". En cuanto a la
administración de bienes del menor—sigue Puig Peña—"los
padres tienen, además de los deberes anteriores, el de admi-
nistrar fielmente los bienes pertenecientes a los hijos, situados
en su potestad. Configurada esta administración tradicio-
nalmente como un exclusivo beneficio diverso, pues se entiende
que forma parte del complejo de deberes inherentes a la
patria potestad ... Consecuencia de este criterio es la *irre-
nunciabilidad de esta administración*, pues que se halla esta-
blecida principalmente en ventaja de los menores y para
mantener el mejor orden en la familia" .... En cuanto *al
derecho de representación*—art. 155 del Código Civil español
(1953 del Código civil puertorriqueño)—sigue Puig Peña, la
misma compete al padre .... "representación que, no obstante
la incompleta redacción del Código, *debe estimarse tan amplia
en las facultades como correspondiente a una función que es
de Derecho natural*, y, por lo menos, equivalente a la atribuída
al organismo tutelar, sin otras limitaciones que las taxativa-
mente señaladas por las disposiciones legales", (ciertos casos
de representación en juicio y representación en caso de inte-
reses opuestos): Puig Peña—Tratado de Derecho Civil
español—Tomo II, volumen II, págs. 152, 153, 154, 178, 180,

(edición de la Editorial Revista de Derecho Privado de 1951).
Por la misma razón, *el usufructo legal* que tiene el padre sobre
los bienes de los hijos *no puede renunciarse ni enajenarse*
—Puig Peña obra y edición citadas 175—porque no se trata
de un derecho del padre "de un derecho propio, sino de una
asignación que la ley le concede para el mejor cumplimiento
de los fines típicos de la patria potestad", de lo que se infiere,
"que no tiene el padre en este usufructo todos los derechos que
competen al usufructuario normal".

Hemos hecho esta digresión para dejar claramente esta-
blecido, que en Puerto Rico, no se puede partir del principio
de la libertad absoluta del padre para organizar, en la forma
que más prudente crea, patrimonios que estén relacionados
con la organización interna de la familia, como puede hacerse
en el Derecho anglosajón. No se puede renunciar a la admi-
nistración por el padre de los bienes de sus hijos menores
—aunque se trate de bienes donados: art. 157 de nuestro
Código Civil—ni a la representación de las acciones que com-
petan a los mismos ni se puede renunciar o enajenar el usu-
fructo legal que tiene el padre sobre los bienes de los hijos
menores, por tratarse de deberes públicos, no sujetos a contra-
tación privada.

Casualmente lo que crea el fideicomiso *inter vivos*, hecho
por el padre a beneficio de hijos menores que vivan en com-
pañía de sus padres, es una evasión del derecho del Estado a
investigar toda enajenación de bienes de menores, para san-
cionarla o desautorizarla; una renuncia del padre a favor
de tercera persona de la administración del caudal minori-
tario; una renuncia del padre a favor de otra persona de la
representación del menor en las acciones que competen a dicho
caudal; y una renuncia a favor de otra persona del usufructo
legal que para bien del menor disfruta el padre sobre los
bienes de un hijo menor. No es posible imaginar siquiera
que pudo ser la intención legislativa, sacrificar la mayor parte
del estatuto de familia, para autorizar el uso de un solo
contrato.

En la actual opinión de la mayoría se estudia la posibilidad de autorizar, como un contrato *inter vivos*, una donación de un padre a favor de un hijo menor de edad, que viva en compañías de su padre, sin resolver, desde luego, cómo es que se perfecciona el contrato mediante la aceptación del menor, que es el verdadero punto álgido de la cuestión. En la opinión anterior de este caso, considerando el posible impacto del art. 156 del Código Civil de Puerto Rico, que dispone, pertenecer al padre o la madre en propiedad y en usufructo lo que el hijo adquiera con caudal de cada uno de ellos, y en una situación de hechos apropiada, como resultaba ser el traspaso a favor de dos hijos menores de unas acciones corporativas pertenecientes al padre, y ante la alegación del Secretario de Hacienda, que dicho traspaso equivalía a una donación, resolvimos que dicha donación produciría la anomalía en derecho de ser una donación en beneficio del propio donante porque el art. 156 no reconoce la separabilidad de bienes o utilidades entre menores de edad que vivan en compañía de sus padres y dichos padres, cuando tales bienes provengan del caudal de los padres. Puede ser que el lenguaje utilizado no fuera lo suficiente preciso, y después de considerarlo de nuevo, creo que debemos esclarecerlo más.

La donación cuando ha de producir sus efectos *inter vivos* se regirá por las disposiciones generales de los contratos: art. 562 del Código Civil de Puerto Rico. Existe una prohibición general en el sentido que los padres no contraten con sus hijos menores de edad, porque la ley considera el contrato como la concurrencia de dos o más voluntades distintas y autónomas. Desde la Partida 5ª (Ley II Título V) se estableció que no es posible el contrato entre el padre y el hijo, porque ambos "según natura y derecho" son contados por una persona. El artículo que hay que aplicar es el art. 1213 de nuestro Código civil, que dispone: "no hay contrato sino cuando ocurren los requisitos siguientes: 1—*consentimiento de los contratantes;* 2—objeto cierto que sea materia del contrato; 3—causa de la obligación que se establezca".

Castán al tratar de la nulidad absoluta o radical de los contratos, señala: "puede considerarse en nuestro Derecho inexistente o radicalmente nulo el contrato en los siguientes casos: (A) cuando le falta de hecho alguno de los elementos esenciales a su formación (hipótesis del artículo 1261 [1213 nuestro]: o sea: (*a'*) cuando hay defecto absoluto de consentimiento, como en el caso del acto que se ha llamado vacío o supuesto (con simulación absoluta) o el de que no llegara a formarse dicho consentimiento por faltar la conformidad entre la oferta y la aceptación; (*b'*) *defecto de concurrencia de dos voluntades distintas y autónomas (Sentencia de 6 de marzo de 1909 (España) dictada a propósito de un contrato celebrado por un padre con sus hijos menores)*; (*c'*) defecto de objeto; (*d'*) ausencia o ilicitud de la causa, (art. 1275), [1227 nuestro]; (*e'*) inobservancia de las formalidades prescritas con carácter de requisito esencial (como en la hipoteca o la donación de bienes inmuebles sin escritura pública; (B) cuando *el contrato se ha celebrado en violación de una prescripción o prohibición legal fundada sobre motivos de orden público* (hipótesis del art. 4 del Código) [4 nuestro]; así sucede en los pactos sobre sucesión futura (art. 1271), [1223 nuestro], sociedades universales entre cónyuges, transacciones sobre el estado civil, convenciones usurarias de la Ley de 23 de julio de 1908, etcétera . . . . en términos generales, cabe decir que el contrato inexistente o nulo con nulidad absoluta no produce efecto jurídico alguno como tal. Su característica es precisamente la carencia de efectos específicos *Quod Nullum est Nullum producit effectum.* El derecho considera a dicho contrato como no realizado": 3 Castán—Derecho Civil Español, Común y Foral 437–438 (Octava ed. del Instituto Editorial Reus de 1954).

La regla general en cuanto a donaciones de padres a hijos menores que vivan en compañía de sus padres, es que los hijos menores no pueden aceptar por sí mismos, donaciones graciosas hechas por sus padres a favor de dichos hijos menores, aunque pueden aceptar por sí mismos, donaciones

graciosas hechas por terceras personas a favor de dichos menores, cuando tengan discernimiento para ello, según resolvimos en la opinión inicial de este mismo caso—*Alvarez* v. *Secretario de Hacienda*, 78 D.P.R. 412, cita precisa a las págs. 416–418—donde dejamos claramente establecida la especialidad, que en cuanto a donaciones hechas por terceras personas, consagra nuestro Código civil—arts. 567 y 568—.

El error que cometimos al resolver el caso de *Piris* v. *Registrador*, 67 D.P.R. 811—en el cual se resuelve que un hijo menor puede aceptar una donación que le hace su padre—fué aplicar a una donación graciosa entre padre e hijo, la regla que permite a un hijo menor, con discernimiento, aceptar donaciones graciosas hechas a su favor por una tercera persona. Si se examinan las autoridades que citamos en dicho caso, se verá que todas se refieren a la regla que le permite a un hijo menor aceptar donaciones graciosas a su favor, hechas por terceras personas. En la última edición de la misma obra de Castán antes citada, éste nos informa, que: "por otra parte, de la Resolución de la Dirección de los Registros de 29 de diciembre de 1922 puede inferirse, aunque no se declare expresamente, que los menores de edad no pueden comparecer ante Notario, con el objeto de aceptar donaciones": I–II Castán—Derecho Civil Español Común y Foral 154, escolio 3—(novena ed. del Instituto Editorial Reus de 1955). De esta Resolución nos ocuparemos más adelante.

Si el hijo no puede aceptar donaciones graciosas hechas a su favor por su padre, la pregunta siguiente es ¿quién puede aceptarlas a nombre del hijo? Para hacer lo más corto posible un debate apasionante—Scaevola, De Diego Valverde, Castán, Puig Peña—se ha sugerido la solución que la aceptación se efectúe a través de un defensor judicial, como si se tratara de un caso de interés opuesto entre el padre y el hijo—art. 160 de nuestro Código Civil.

Pero a la universalidad de dicha regla se ha opuesto un principio moral—que el hijo no pierda dependencia, con respecto a su padre, en su concepción íntima de la patria

potestad—y un principio legal—que siendo el padre el verdadero representante legal de su hijo menor, el nombramiento de un defensor judicial, en un caso que no es típico del interés opuesto, sería autorizar una renuncia al deber de representación que lleva consigo la patria potestad—y no justificada del todo, puesto que para el acto de la mera liberalidad, quedaría abierta siempre la posibilidad del acto unilateral de donación escrituraria que haría fe contra terceros de su fecha y del hecho que motiva su otorgamiento,—art. 1172 del Código Civil de Puerto Rico—sujeto a aceptación por el hijo al quedar habilitado por la emancipación o la mayoridad—art. 565 y 575 de nuestro Código Civil y la donación por testamento.

También se ha estudiado la posibilidad que la aceptación del menor se realice, en representación de él, por el propio padre donante, en una especie de autocontrato, aplicando a un solo patrimonio, el poder de disposición que en la teoría estricta del autocontrato, se aplica a la disposición de dos patrimonios concentrados en una misma persona.

La teoría del autocontrato en el caso de la donación de padre a hijo menor, se basa en dos abstracciones, muy discutibles ambas: (1) que la donación graciosa es, en su esencia, un puro acto de liberalidad cuyas consecuencias económicas se resuelven normalmente a favor del donatario, y por lo tanto, no debe considerarse como un contrato, y (2) que en la donación graciosa no es rigurosamente necesario presuponer un interés opuesto entre el padre y el hijo—supuesto del nombramiento del curador *ad litem*—siendo posible, en principio, autorizarse la concurrencia en un solo sujeto jurídico de la doble cualidad de donante y donatario. Este fué el principio que se aplicó en la famosa y bastante problemática Resolución del 29 de diciembre de 1922 de la Dirección General de los Registros: V—Rosa Sastre y Molina Juyol—Jurisprudencia Registral—761–766 (ed. de la Casa Editorial Bosch de 1953), que por cierto denegó la inscripción de la escritura de donación porque dos de sus cláusulas implicaban una renuncia o transacción sobre la legítima futura.

Basta reflexionar un momento para darse cuenta que difícilmente podría concebirse en el mundo contemporáneo, una donación graciosa, en la cual, sus consecuencias económicas se resuelvan indefectiblemente a favor del donatario, tanto en el momento de su otorgamiento como posteriormente. Yo no sé cuál pueda ser la filosofía económica, que sobre este asunto, impere en España; pero aún dentro de los principios rectores del propio Código civil español, que considera a toda propiedad y sus rentas como cosa limitada y sujeta a la órbita del Derecho público y a toda transmisión de bienes, hasta cierto extremo, normada, es muy difícil concebir esta regalía abstracta que pretende la Dirección general, en la cual todo se resuelve indefectiblemente en favor del donatario.

Es siempre un criterio más seguro concebir toda transmisión de bienes como un complejo de derechos y obligaciones presentes y futuras, capaz de resolverse en cualquier momento, en una verdadera carga. Esta es una experiencia, por excelencia americana, característica de la mecánica de la depresión y de la economía de emergencia, que tiene su punto neurálgico casualmente en la contribución de ingresos.

En cuanto al caso que nos ocupa—diversificación de una contribución de ingresos donde el contribuyente alega que parte de la contribución debe imponerse sobre el patrimonio del hijo menor, sujeto a fideicomiso, que es en realidad de derecho, y por declaración expresa de la Ley núm. 103 de 25 de abril de 1950, una donación—demuestra que la potencialidad del interés opuesto no es tan fácil de descartar en la donación graciosa como se supone. Es indudable que el efecto más inmediato y patente de toda donación paterna, es transferir al hijo, parte de la carga contributiva del padre. Siendo esto así, nos encontraríamos en el caso típico del interés opuesto, donde debe intervenir la autoridad judicial, criterio que rechazamos en el caso de *Belaval v. Tribunal de Expropiaciones*, 71 D.P.R. 265.

Es curioso observar la reacción de los civilistas españoles sobre esta resolución del 29 de diciembre de 1922 de la Direc-

ción General de los Registros. Valverde, al referirse a dicha resolución, afirma que "en los actos consigo mismo fuera del campo de la representación, tal ocurre con la hipoteca del propietario, estimo que no pueden llamarse contratos sino actos jurídicos unilaterales, por lo mismo que no hay colisión ni oposición de intereses de distintas personas y la doble personalidad del emitente de la declaración, no hay inconveniente en admitirla y darla validez. (P) Pero la autocontratación *cuando opera en el campo de la representación*, necesita de ciertas garantías: la voluntad doble de un sujeto para que el derecho la otorgue plena eficacia. En la representación voluntaria *solamente cuando el mandatario esté autorizado expresamente* para el *selbstcontrahiren* (autocontrato) podrá realizar actos que tengan absoluta validez, y en la representación legal, la de los tutores y la de los padres, v. gr., el derecho deberá exigir *o la autorización expresa de la ley* para simplificarles, *o la ratificación de los actos por los representados*, o la *intervención de otras personas u organismos que ostenten la representación de los protegidos en estos casos,.* pues solo así pueden estar garantizados los intereses de aquéllos a quienes la ley otorga su función protectora ... Los códigos civiles europeos son contrarios a la validez de los actos realizados consigo mismo por los representantes legales y adoptan garantías muchos de ellos para darles eficacia, hacen intervenir a otras personas o exigen requisitos especiales de forma, *pero en general, puede afirmarse que son opuestos a tales actos*" ...... Vide: Revista Crítica de Derecho Inmobiliario, tomo II, núm. 19, págs. 782 y 783 (1926).

Por su parte, Castán, al reafirmar su glosa sobre la capacidad del menor para aceptar donaciones hechas por terceras personas, que acotamos extensamente en nuestra opinión original en este mismo caso, (págs. 417 y 418), le dedica esta pequeña nota: "por otra parte, de la Resolución de la Dirección de los Registros de 29 de diciembre de 1922 puede inferirse, aunque no se declare expresamente, que los menores de edad no pueden comparecer ante notario, con el objeto de

aceptar donaciones". 1-2 Castán—Derecho Civil Español, Común y Foral—154 escolio 3— (*novena* ed. del Instituto Editorial Reus de 1955).

Puig Peña, por el contrario, "señala el desacuerdo existente entre el Tribunal Supremo de España y la Dirección General de los Registros". Dice que mientras la Resolución de 30 de mayo de 1930—que, por cierto, también denegó la inscripción solicitada, inspirada en la Resolución del 29 de diciembre de 1922—no excluye en absoluto la posibilidad de la autocontratación, cuando no vaya acompañada de contradicción de intereses *o de peligro de lesión presente o futura* de los derechos de una de las partes, el Tribunal Supremo de España, en la sentencia de 6 de marzo de 1909,—que acotamos en la presente opinión—fué opuesto a su admisión por estimar que en todo contrato han de concurrir siempre dos o más voluntades distintas y autónomas: IV—II Puig Peña—Tratado de Derecho Civil Español 28-29 (Editorial Revista de Derecho Privado *1951*).

La glosa en que parece descansar la opinión de la mayoría es en el estudio de Federico de Castro sobre "El Autocontrato en el Derecho Privado Español", 151 Revista General de Legislación y Jurisprudencia, 395-455 (1926), cita precisa a las págs. 416-421 donde se comenta la Resolución del 29 de diciembre de 1922. Si se examina detenidamente este estudio en su totalidad sobre todo a las págs. 362 a 386, se ve, según lo informa Castán, que "en él se estudia el autocontrato *desligado de la figura de la representación*, considerándolo como un acto unilateral de características especiales que puede darse en todas aquellas situaciones en que una persona, *con poder de disposición sobre dos patrimonios independientes*, crea entre ellos relaciones jurídicas obligatorias"—3 Castán Derecho Civil Español Común y Foral 354 escolio (1) (octava ed. del Instituto Editorial Reus *1954*)—como sería el caso del "titular de un patrimonio y administrador de otro, o el administrador de dos patrimonios ajenos y distintos, establece una relación jurídica entre el propio y el ajeno o entre los dos

ajenos" o "el caso de dos patrimonios especiales, por ejemplo la dote y los parafernales, o los bienes libres y los gravados de substitución, o el patrimonio propio y el adquirido a virtud de herencia aceptada a beneficio de inventario". Pero "en el caso de la representación, el conflicto de intereses es mucho más frecuente que en el de patrimonios especiales pertenecientes a un mismo titular; lo que hace que el acto jurídico consigo mismo sea más raramente posible en el primer caso": —3 Castán obra y ed. citadas 354.

Como se ve, el contrato del padre con un hijo menor no debe favorecerse, ni aún bajo la teoría del autocontrato, que todavía no es más que eso, una teoría, entre las muchas teorías que pululan por la literatura jurídica, buscando su porvenir legislativo, hasta hoy sólo aplicada como una fórmula práctica dentro de la jurisprudencia registral, y todavía no aceptada por la jurisprudencia civil del Tribunal Supremo de España.

Esta imagen del padre encerrado en un despacho con su notario, disponiendo a espaldas del orden público, la organización futura de los bienes de su hijo menor, es una imagen feudal que no puede menos que lastimar la conciencia liberal de nuestro nuevo tiempo civilista. Para el fomento de la independencia económica del hijo menor, en edad oportuna, el Derecho civil tiene la institución del peculio profecticio, mucho mejor razonada y de un engranaje más cuidadoso, tanto dentro de los elementos espirituales de la patria potestad, como dentro de los elementos sociales del Derecho de familia. Demás está decir el terrible impacto que sobre todo nuestro instituto contributivo de ingresos, ocasionará dicho autocontrato paterno. Es lo mismo que si se dejara a discreción del contribuyente la distribución de la carga contributiva.

Es curioso observar, que al momento de consagrar, en una forma indirecta, el autocontrato paterno, la opinión de la mayoría, por un lado, vuelve a revivir el caso de *Piris* v. *Registrador*, supra, en el cual se resuelve que el hijo menor de edad puede aceptar por sí mismo, la donación de su padre, y por el otro lado, se consagra el autocontrato paterno, en el

cual, el padre mismo es el que acepta, en representación de su hijo menor, la donación que el mismo padre hace. Pero en cuanto al último aspecto de la cuestión, que es de suma importancia, puesto que de la separabilidad de bienes o utilidades entre menores de edad y sus padres se trata, cuando los bienes donados provengan del caudal de los padres, guarda silencio. Pero en un caso de contribución sobre ingresos es cuestión esencial saber a quién pertenecen las rentas o el usufructo de los bienes donados por sus padres a un hijo menor.

Hay dos maneras de resolver este asunto: (1) o considerar esta donación graciosa como cualquier otro patrimonio adquirido por trabajo, industria o título lucrativo de tercera persona, en cuyo caso le corresponderían a los menores la propiedad y el usufructo a los padres que les tengan en su potestad y compañía—supuesto del art. 155 del Código Civil nuestro—(2) o, considerar dicha donación como cualquier otro patrimonio adquirido con caudal de sus padres, en cuyo caso le corresponderían a los padres que les tengan en su potestad y compañía, tanto la propiedad como el usufructo, de lo que el hijo adquiera—supuesto del art. 156. Para mí resulta indubitable, que salvo en los casos de renuncia que permite la Ley—caudal entregado para que los hijos trabajen con él o de la donación o legado por terceras personas para gastos de su educación o instrucción—el usufructo paterno se extiende sobre el resto de todos los demás bienes pertenecientes al hijo menor y no resulta renunciable, por ser contrario al Derecho público. Por entenderlo así, afirmo, que en cuanto a rentas y utilidades se refiere, que es la cuestión que aquí nos ocupa, una donación graciosa hecha por un padre a favor de un hijo menor, produce la anomalía en derecho de ser una donación en favor del propio donante, puesto que dichas rentas y utilidades siempre corresponderían al padre en usufructo, y por ello, sería tasable como ingreso del padre.

Por otro lado, la opinión de la mayoría encuentra apoyo, para darle validez a un fideicomiso *inter vivos*, hecho por el padre a favor de hijos menores que vivan en su compañía, en

la disposición del art. 845 de nuestro Código Civil, referente a fideicomisos, que establece: "la constitución de fideicomiso a favor de persona no existente, a excepción únicamente de hijos futuros del fideicomitente, será nula y sin valor". Entiende la mayoría que "es difícil creer que la Asamblea Legislativa tuvo por miras el permitir la creación de tales fideicomisos establecidos por un padre en beneficio de hijos por nacer y prohibirlos para hijos ya nacidos".

Como se ve, a primera vista, se trata de la reformulación, por demás innecesaria, de la típica substitución fideicomisaria por sobreveniencia de hijos—posición jurídica del *nascitarus*, según nos advierte Puig Peña, para evitar la anulación del fideicomiso, que no puede nunca afectar la legítima, por el advenimiento de un hijo póstumo, en la misma forma que se usa en nuestro ordenamiento hereditario, para evitar la anulación de la institución de herederos por el advenimiento del hijo póstumo—art. 742 del Código Civil de Puerto Rico. Tal disposición solo podría utilizarse en un fideicomiso *mortis causa*. Así lo reconoce el propio doctor Alfaro—obra y ed. citadas págs. 81. Su aparición en el texto de nuestro articulado, referente a fideicomisos, lo explica el hecho que el proyecto-modelo del doctor Alfaro fué diseñado para servir lo mismo de fideicomiso *inter vivos* que de fideicomiso *mortis causa*, situación, que por lo visto, prefiere ignorar la opinión de la mayoría.

Conclusiones finales: nada hay en la historia legislativa del fideicomiso puertorriqueño que nos permita concluir, que al adaptar la Asamblea Legislativa de Puerto Rico algunos de los aspectos del fideicomiso panameño, fuera su intención dejar sin efecto las instituciones referentes al orden interno de la familia y enajenar el poder del Estado en todo lo referente a contratación de menores.

Todo fideicomiso *inter vivos* a beneficio de tercero, participa de la naturaleza de un contrato, y para su perfeccionamiento requiere el consentimiento expreso de las tres partes que quedan obligadas por sus términos. La mera aceptación

por el fiduciario del mandato del constituyente, no obliga al menor beneficiario, ni crea la individualización del patrimonio fideicometido a favor de dicho menor.

La transmisión de bienes del fideicomitente al fiduciario no es en pleno dominio, puesto que la misma conserva todas las características de una relación entre mandante y mandatario. Es sólo a través de la aceptación por el tercero beneficiario, que un fideicomiso *inter vivos* puede lograr la individualización del patrimonio fideicometido, como algo distinto al patrimonio del constituyente.

Aunque un hijo menor, con discernimiento, puede aceptar una donación graciosa que le haga una tercera persona, no puede aceptar una donación que le haga su padre, por no existir en este último caso, la concurrencia de dos voluntades distintas y autónomas. La aceptación por el propio padre donante, en representación de su hijo menor, de una donación hecha por aquél a favor de éste, no debe ser favorecida.